IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| LIANE TOWNSEND, | ) | CASE NO. 1:17-CV-2069 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Liane Townsend ("Townsend") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB"). Doc. 1. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned Magistrate Judge pursuant to the consent of the parties. Doc. 12.

As explained more fully below, the ALJ's decision at Step Three is not supported by substantial evidence and there are other errors in the decision warranting reevaluation of the evidence. Accordingly, the Commissioner's decision is **REVERSED and REMANDED** for further proceedings consistent with this opinion.

### I. Procedural History

Townsend protectively filed her application for DIB on June 24, 2014, alleging a disability onset date of September 11, 2013.[1] Tr. 19, 179. She alleged disability based on the following: back problems, neuropathy in extremities, carpal tunnel, diabetes and dysthymia. Tr.

---

[1] In her brief, Townsend states that she also filed an application for Supplemental Security Income ("SSI") that was "presumably[] denied due to resources as her husband works full-time" but the Commissioner did not include "such denial" in the transcript. Doc. 14, pp. 1-2. Townsend makes no further mention of her SSI application and does not appeal the Commissioner's decision as to her SSI application.

213. After denials by the state agency initially (Tr. 89) and on reconsideration (Tr. 104), Townsend requested an administrative hearing (Tr. 138). A hearing was held before Administrative Law Judge ("ALJ") Catherine Ma on March 16, 2016. Tr. 43-88. In her August 3, 2016, decision (Tr. 19-35), the ALJ determined that there are jobs that exist in significant numbers in the national economy that Townsend can perform, i.e. she is not disabled. Tr. 33. Townsend requested review of the ALJ's decision by the Appeals Council (Tr. 177) and, on August 28, 2017, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-4.

## II. Evidence

### A. Personal and Vocational Evidence

Townsend was born in 1978 and was 36 years old on the date her application was filed. Tr. 33. She previously worked as a manager at Burger King, a home health aide, a nursing assistant and a registered nurse. Tr. 53-59. She last worked in September 2013. Tr. 47-48.

### B. Relevant Medical Evidence[2]

On July 8, 2013, Townsend saw Michael Harris, M.D., at MetroHealth, for a follow up visit. Tr. 462. Dr. Harris remarked that Townsend had suffered a back injury in 2000, was well-known to him as he had treated her regularly, and that he had not seen her for three years. Tr. 462. Townsend explained that she had been off all medications during the intervening time because she was either pregnant or nursing, and she now needed something for her lumbar pain to allow her to get into an active therapy program. Tr. 462. Dr. Harris commented that Townsend's pain was likely due to the fact that she had gained 50 pounds since he had seen her. Tr. 462. Upon exam, she had a marked limitation of range of motion in all planes of her lumbar

---

[2] Townsend only challenges the ALJ's findings regarding her spine impairments. Accordingly, only the medical evidence relating to these impairments are summarized and discussed herein.

2

spine and tenderness to palpation in the lumbo-sacral junction on the midline, but negative straight leg raise testing and normal strength, sensation, and reflexes. Tr. 462-463. Dr. Harris prescribed Voltaren, Flexeril, Vicodin, and gave her a Toradol injection. Tr. 463.

On September 12, 2013, Townsend was working as a nurse at MetroHealth and injured her upper back "after boosting a patient up in bed." Tr. 362, 317. She went to the emergency room. Tr. 362. Upon exam, she had right sided paraspinal thoracic tenderness, full muscle strength and flexion in her extremities, normal neurological findings, and no sensory deficits. Tr. 363. She was given a Toradol injection, which did not help her pain, and Percocet, which did, and she was discharged 1.5 hours later in stable condition with a diagnosis of a back strain. Tr. 364.

Four days later, Townsend saw Todd Hochman, M.D., of Westpark Occupational Medicine and Therapy. Tr. 317-318. Upon exam, she had right sided paraspinal tenderness in her thoracic area and muscle spasms and her pain radiated around to her chest wall. Tr. 318. She also experienced right shoulder tenderness and a limited range of motion. Tr. 318. Dr. Hochman diagnosed a thoracic sprain/strain, recommended pain medication (including continuing her current medication for her lumbar issue and adding a prednisone taper) and physical therapy, and released her to try light duty work as of September 30, 2013. Tr. 318. At a follow up visit on October 21, Townsend reported that she was still not working because her employer could not accommodate her light duty status. Tr. 315.

A thoracic spine MRI on November 8, 2013, showed no evidence of acute fracture or ligamentous injuries, a small central disc bulge at T7-T8, a central protrusion at T8-T9, and no frank cord compression. Tr. 629.

On November 18, 2013, Townsend followed up with Dr. Hochman, who reviewed Townsend's physical therapy records and wrote that therapy was somewhat beneficial but that Townsend still had fairly high pain levels. Tr. 314. He recommended a "second opinion pain management consultation." Tr. 314.

On February 6, 2014, Townsend saw David Ryan, M.D., for a pain consultation at Southwest General. Tr. 624-631. She reported taking Tramadol, Tylenol and Voltaren; her Neurontin caused too much sedation and was discontinued. Tr. 625. Her pain medications were not providing adequate relief and she was on her second course of physical therapy. Tr. 625. Upon exam, she had pain in her thoracic and lumbar region. Tr. 629. Dr. Ryan wrote that Townsend's ongoing pain issues had been mostly conservatively managed for many years until her recent thoracic injury. Tr. 630. He advised her to continue pain medications, added additional medications, and recommended medial branch blocks. Tr. 630.

On February 19, Townsend saw Dr. Harris for a follow up visit. Tr. 448. Dr. Harris wrote that she had been doing fairly well for a while, although never pain free, but that her pain has gotten progressively worse over the last week. Tr. 448. Upon exam, she was obese, in obvious discomfort, had markedly positive straight leg raise testing, obvious sensory deficits in the left L5 nerve root distribution with weakness in the extensor hallucis longus and tibialis anterior, normal reflexes and a very limited range of motion. Tr. 448. Dr. Harris diagnosed a recent aggravation in symptoms related to a 2000 work injury, with a marked increase in her low back and left radicular symptoms; continued her medications, gave her a Toradol injection, and ordered a lumbar MRI; and wrote that she would likely need pain injections. Tr. 448.

On May 12, 2014, Townsend transferred care of her lower back pain from Dr. Harris to Dr. Hochman. Tr. 517. She detailed her lower back injury history, including her past treatment

with Dr. Harris and a lumbar surgery she had in 2001. Tr. 517, 516. Upon exam, she had positive straight leg raise testing and numbness and weakness in her left lower extremity. Tr. 517. Dr. Hochman's working diagnosis was an L4-5 herniation, lumbar sprain/strain, and dysthymic disorder. Tr. 517. He reiterated that Townsend had been released with work restrictions for her thoracic injury that the employer could not accommodate, ordered a lumbar MRI, and referred her to work with a physical therapist. Tr. 517.

A lumbar MRI taken June 30, 2014, showed "post-surgical changes ... again seen in the left neural foramina and lateral recesses at L4-L5," mild to moderate narrowing of the left neural foramina due to disc osteophyte complex, mild mass effect on the exiting nerve root with no significant narrowing of the spinal canal, mild encroachment at this level suggestive of post-operative scarring and granulated tissue, and no significant interval changes or new disc herniation. Tr. 369. The visualized portion of the spinal cord was unremarkable with no abnormal signal intensity. Tr. 369.

On July 10, 2014, Townsend followed up with Dr. Hochman for her low back pain. Tr. 509. Dr. Hochman remarked that Townsend was doing the best she could with physical therapy, but needed a corticosteroid taper. Tr. 509. Her Flexeril helped with spasms but caused too much sedation; Dr. Hochman switched her to Skelaxin. Tr. 509. She would be following up with pain management. Tr. 509. The same day, Dr. Hochman wrote a letter to Townsend's Worker's Compensation attorney opining that Townsend was suffering from a post-laminectomy syndrome in her lumbar spine and that this injury should be included with her thoracic injury claim. Tr. 515.

On August 7, 2014, Townsend returned to Dr. Ryan for pain management treatment for her radiating low back pain, reporting a sudden onset in February 2014 in which she "had to call

5

for help to assist her." Tr. 495. She said pain medication (Lyrica and Vicodin) had helped. Tr. 495. On exam, she had decreased sensation of her left lateral thigh with paresthesias of burning following palpation. Tr. 500. Her left hip dorsiflexion was 4/5 and the remainder of her lower extremities were 5/5. Tr. 501. She walked with a cane and had 12/18 fibromyalgia trigger points. Tr. 501. Dr. Ryan remarked that Townsend's pain was consistent with L4 radiculitis if not radiculopathy; commented that, if her pain was related to scar tissue formation in her lumbar spine, she would not benefit from surgery but, "given the mass effect on the nerve root, surgery may be a reasonable option." Tr. 501. Her exam was "somewhat consistent with fibromyalgia," which was a complicating factor with respect to diagnosing and treating her pain. Tr. 501. Dr. Ryan recommended a trial epidural steroid injection. Tr. 501.

The following day, Townsend saw Dr. Hochman; she was tearful in moderate to moderately severe discomfort with tenderness to palpation and positive straight leg raise testing. Tr. 505. Dr. Hochman opined that injections would likely be beneficial, ordered a TENS unit, which Townsend said had helped in the past, and submitted a second opinion surgical consultation. Tr. 505. He commented that Townsend was having difficulty with her routine daily activities, her condition was deteriorating, and she was frustrated and tearful. Tr. 505.

On September 4, 2014, Townsend returned to Dr. Hochman, who observed that she had quite a bit of discomfort to the left of midline, extreme discomfort with straight leg raise testing on the left, and ambulated with an antalgic gait using a 4-prong cane. Tr.488. Dr. Hochman reported that Townsend's condition had deteriorated and that she could not even function in a sedentary duty occupation. Tr. 489.

On October 10, 2014, Dr. Hochman reported that Townsend was approved for a second opinion surgical consultation in order to evaluate for surgical treatment options, such as a fusion.

Tr. 490. In the event that fusion was not an option, he recommended continued treatment options including injections or a spinal cord stimulator. Tr. 490.

On November 6, 2014, Dr. Hochman examined Townsend; upon exam, she continued to be in moderate to moderately severe pain, had midline discomfort and tenderness to the left, "quite a bit of pain" with straight leg raise testing on the left, and an antalgic gait using a 4-prong cane. Tr. 486. Dr. Hochman wrote, "I will also request a 4-pronged adjustable adult cane." Tr. 675. On December 4, she had quite a bit of pain with straight leg raise testing, an antalgic gait, and difficulty sitting comfortably during the examination. Tr. 674.

On December 31, 2014, her date last insured, Townsend saw Rishi Goel, M.D., for a neurosurgical evaluation for her low back pain at St. John Medical Center. Tr. 685-687. She reported pain in her low back and left leg for 15 years, which had improved with rest, medications, and epidural blocks. Tr. 686. She stated that she had an acute flare-up in February 2014 that caused a worsening of her chronic leg pain. Tr. 686. Upon exam, she had a normal gait and ambulation, 4+/5 strength in her left leg, full strength in her right leg, and grossly intact sensation. Tr. 687. Dr. Goel diagnosed degenerative disc disease and a moderate left-sided disc bulge at L4-L5 and recommended lumbar epidural blocks. Tr. 687.

On May 29, 2015, Townsend had a routine examination with Anthony Finizie, M.D. Tr. 710. She reported that her back care had been put on hold due to her recent pregnancy. Tr. 712.

**C. Function Report**

Townsend completed a function report in August 2014. Tr. 225-232. She wrote that she got her children up in the morning and fed them, made sure they ate, changed their diapers, and fed family pets. Tr. 226. The following people helped her care for her children: her husband, mother, brother and friend. Tr. 226. She prepared simple meals daily, including cereal, toast,

7

and sandwiches, and she occasionally prepared something using the oven if she had help getting it in and out. Tr. 227. Her household chores included doing a few dishes; wiping off the stove, sink, and toilet; and vacuuming a "5 x 8" carpet on rare occasions. Tr. 227. She left home a few times per week, drove short (15 minute) distances, shopped in stores and on the computer for groceries and her children's needs, and occasionally repaired items using a sewing machine. Tr. 228-229. She used a quad cane outside her home and a walker inside her home. Tr. 231. Her husband completed a function report the same day and wrote that Townsend cared for their children until he got home from work. Tr. 237.

### D. Medical Opinion Evidence

#### 1. Treating Source

On October 31, 2014, Dr. Hochman completed a physical medical source statement on behalf of Townsend. Tr. 666-667. He opined that she could lift and carry 10 pounds occasionally and 5 to 10 pounds frequently, stand or walk for up to 2 hours in an 8-hour workday, for 15 minutes without interruption, and sit for up to 2 hours in an 8-hour workday, for 15 minutes without interruption, and would need to alternate positions at will about every 15 minutes. Tr. 666-667. She could rarely climb, balance, stoop, crouch, kneel, and crawl, push or pull; occasionally reach; and frequently perform fine and gross manipulation. Tr. 667. He indicated that she had been prescribed a cane, brace, and TENS unit. Tr. 667. Her pain was moderate to severe and she would need frequent breaks. Tr. 667. His assessment was based on lumbar post-laminectomy syndrome and thoracic disc protrusions. Tr. 666-667.

A year later, in October 2015, Dr. Hochman completed a second physical medical source statement and opined that Townsend could lift and carry 10 pounds occasionally and 5 pounds frequently, stand or walk for 2 hours in an 8-hour workday for 10 to 15 minutes without

8

interruption, and sit for 2 to 4 hours in an 8-hour workday for 30 minutes to 1 hour without interruption. Tr. 715. His postural and manipulative evaluation remained the same; she would need additional breaks (10 minutes every 40 minutes to an hour); and she would need to elevate her legs at will. Tr. 716. He cited lumbar post-laminectomy syndrome in support of his assessment. Tr. 715-716.

On February 27, 2016, Dr. Hochman responded to a letter from Townsend's attorney handling her DIB claim. Tr. 724. Counsel had asked Dr. Hochman if and when he prescribed a walker to Townsend and he responded that he did but provided no date; counsel asked Dr. Hochman if and when he prescribed a quad cane to Townsend and he responded that he did on June 30, 2014. Tr. 724. The letter asked Dr. Hochman to clarify his prior findings that (1) Townsend was released to light duty work and (2) Townsend could not even perform sedentary work. Tr. 724. Dr. Hochman explained that Townsend has two different work-related injuries which have continued to worsen over the years such that it would be extremely difficult for her to sustain any level of employment due to her inability to sit and/or stand for any length of time, difficulty with ambulation and the severity of her pain. Tr. 724.

### 2. State Agency Reviewers

On September 1, 2014, state agency medical consultant William Bolz, M.D., reviewed Townsend's record. Tr. 98-99. Regarding her residual functional capacity (RFC), Dr. Bolz opined that Townsend could lift 20 pounds occasionally and 10 pounds frequently, stand or walk for 4 hours and sit for about 6 hours in an 8-hour workday, and push or pull without additional limitations. Tr. 98. Due to her degenerative disc disease, she could never climb ladders, ropes or scaffolds; could occasionally stoop, kneel, crouch and crawl; and could frequently balance. Tr.

99. On January 29, 2015, Lynne Torello, M.D., reviewed Townsend's record and adopted Dr. Bolz' opinion.  Tr. 117-118.

**E. Testimonial Evidence**

**1. Townsend's Testimony**

Townsend was represented by counsel and testified at the administrative hearing.  Tr. 43.  She testified that she lives in a one-story house with her husband, four children (aged 5, 4, 3 and 1), and three cats.  Tr. 50.  The house has two steps leading up to the door.  Tr. 50.  She is able to drive.  Tr. 51.

Townsend last worked in September 2013 as a nurse.  Tr. 52.  She and another nurse were helping to boost a large patient up in his bed; the patient sat down unexpectedly and pulled Townsend, injuring her thoracic spine.  Tr. 61.  An MRI showed two bulging discs.  Tr. 61.  She also had a history of a workplace injury with respect to her lumbar spine dating back to 1998.  Tr. 60.  She was working at Burger King and slipped in the freezer and then, in 2000, she slipped on a dustpan that had been left out and fell.  Tr. 60-61.  She had a herniated disc and had surgery in 2001.  Tr. 61.  She was able to get back to a functional level after a lot of physical therapy, daily medication and injections.  Tr. 61.  A short time after her thoracic injury, she woke up with pain in her left leg that was new and more intense than she had had before.  Tr. 62.  An MRI showed a progression of her lumbar disc disease.  Tr. 62.  Currently, she was awaiting approval for another steroid injection and otherwise she took medication.  Tr. 62.  She had had a surgery consultation but doctors were leery about performing surgery because: it may cause scar tissue that would exacerbate her problem; she is unable to ambulate now, complicating her recovery; they are not sure if it would just lead to more and more surgeries; and, at the time of her

consultation, she was still tweaking her medications.  Tr. 62.  She also has received an injection in her left foot for plantar fasciitis.  Tr. 63.

Townsend stated that she is able to stand or walk for 20 minutes, less if she is just "static standing."  Tr. 65.  The most she can lift and carry is 5 pounds.  Tr. 65.  She does not carry groceries.  Tr. 65.  She can go shopping with her husband or someone else.  Tr. 65.  She occasionally cooks small meals, like grill a cheese sandwich, but she can't do long duration things.  Tr. 66.  Her brother's girlfriend, Katie, lives next door and comes over to help her feed her children breakfast and get her two older kids ready for school.  Tr. 66.  Katie is also in and out all day; she brings her two kids over to play and she helps Townsend with the kids.  Tr. 69.  For lunch, Townsend only has 2 kids at home with her and they eat easy things like peanut butter and jelly for the older and jarred baby food for the younger.  Tr. 66.  Dinner is made by her husband or her mother, who lives next door.  Tr. 66.  Her husband does the dishes, although Townsend can do some if it's limited to 5 or 10 minutes.  Tr. 67.  Her husband or her children do the laundry; the older child can sort clothes and they can all take turns putting items in the front-end washer.  Tr. 67.  Her husband takes the clothes out.  Tr. 67.  Her husband, Katie, or the kids do the vacuuming, floor cleaning, and picking up around the house.  Tr. 67.  Her husband and her brother do the yard work and her husband takes care of the cats.  Tr. 67, 79.  Townsend is able to shower; she has a shower chair.  Tr. 67.

On a typical day, Townsend wakes up at seven.  Tr. 70.  Katie comes over and helps wake up the two older children that go to school.  Tr. 70.  Katie helps get the clothes ready and sets out cereal boxes for breakfast and Townsend gets the kids dressed.  Tr. 70.  She cannot tie their shoes for them.  Tr. 70.  Close to 8 o'clock, Katie takes the first child to school.  Tr. 70.  When Katie comes back, she gets Townsend's baby up, gets his high chair out, and Townsend

11

makes his cereal. Tr. 70. She feeds him while sitting in the chair while Katie feeds the other child, then takes that child to school. Tr. 70. When Katie comes back they "do the tidy up, get all the dishes at least in a pile in the sink." Tr. 71. Katie is there to help her "with whatever" and Townsend calls or sends a text if she is not already at her house. Tr. 71. Sometimes Katie is in and out; for instance, she will go home to put her own children down for a nap or to do her own laundry. Tr. 71.

For pain, Townsend takes Vicodin, Zanaflex, Baclofen, Voltaren, and Tramadol. Tr. 74. Her Vicodin makes her drowsy and she can't take it when she's alone with her kids, so she has to wait until her husband comes home. Tr. 74. When asked how she takes care of her 1-year old if she can't lift him, she stated that, when he was first born, her friend was with her on a daily basis but that her friend has since moved away. Tr. 75. As her 1-year old has gotten older, he can climb on the couch for her ("I don't lift him") and her 3-year old brings her the diaper. Tr. 75. On a good day, she may be able to do some of the dishes, handle lunch or breakfast by herself, or sit and play a small game with one of her kids. Tr. 75. There is never a time when she is unable to call someone to help. Tr. 76. Falling and staying asleep is a problem; she will find herself with a spasm in the middle of the night. Tr. 76. She gets spasms in her thoracic area (right shoulder, around her rib cage) and her low back, left leg and foot. Tr. 77. The sole of her foot will turn up. Tr. 77.

Townsend was using a quad cane at the hearing, prescribed by Dr. Hochman. Tr. 78. She has been using it since June 2014. Tr. 78. She needed it when she was unable to walk to the bathroom because her leg pain was so bad; every time she tried to pick up her knee, nerve pain would shoot through her back. Tr. 78. Every time she puts her foot on the ground she can't feel the outer portion of her left calf or foot, and sometimes nerve pain will shoot into her hip. Tr. 78.

12

### 2. Vocational Expert's Testimony

Vocational Expert ("VE") Dr. Irmo Marini testified at the hearing. Tr. 79-86. The ALJ discussed with the VE Townsend's past work as an assistant manager at Burger King, a home health nurse and a registered nurse. Tr. 80-81. The ALJ asked the VE to determine whether a hypothetical individual with Townsend's age, education and work experience could perform her past work or any other work if the individual had the following characteristics: can lift, carry, push and pull 20 pounds occasionally and 10 pounds frequently; can stand and walk 4 hours and sit for 6 hours in an 8-hour workday; can occasionally climb ramps and stairs but never ladders, ropes or scaffolds; can frequently balance; can occasionally stoop, kneel, crouch and crawl; can perform simple routine tasks but not at a production rate pace; and is limited to routine workplace changes. Tr. 82. The VE answered that such an individual could not perform Townsend's past work but could perform work as a children's attendant (94,000 national jobs); arcade attendant (65,300 national jobs); and parking lot attendant (71,800 national jobs). Tr. 82-83. The ALJ asked the VE if her answer would change if the individual were limited to sedentary work and the VE stated that it would; such an individual could perform work as a callout operator (17,000 national jobs); circuit board inspector (14,000 national jobs); and telephone information clerk (90,000 national jobs). Tr. 83-84.

Townsend's attorney asked the VE whether her answer would change if the previous hypothetical individual described by the ALJ could only have superficial and occasional contact with others. Tr. 84. The VE answered that such an individual could still perform the job circuit board inspector and could also perform work as a document preparer (103,000 national jobs) and table sorter (14,000 national jobs). Tr. 85. Townsend's attorney asked if the VE's answer would

change if the individual could only occasionally reach in all directions and rarely push and pull, and the VE stated that there would be no work for such an individual. Tr. 86.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[3] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy. *Id.*

### IV. The ALJ's Decision

In her August 3, 2016, decision, the ALJ made the following findings:

1. The claimant last met the insured status requirements of the Social Security Act on December 31, 2014. Tr. 21.

2. The claimant did not engaged in substantial gainful activity during the period from her alleged onset date of September 11, 2013 through her date last insured of December 31, 2014. Tr. 21.

3. Through the date last insured, the claimant has the following severe impairments: major joint dysfunction; degenerative disc disease; diabetes mellitus; affective disorder; and anxiety disorder. Tr. 21.

4. Through the date last insured, the claimant does not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. Tr. 22-23.

5. Through the date last insured, the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b), subject to the following limitations. She can lift, carry, push, or pull 20 pounds occasionally, and 10 pounds frequently. She can stand/walk for 4 hours total in an 8-hour workday, and sit for 6 hours total in an 8-hour workday. She can occasionally climb ramps and stairs, but can never climb ladders, ropes, or scaffolds. She can frequently balance, but only

---

[3] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 *et seq*. The analogous SSI regulations are found at 20 C.F.R. § 416.901 *et seq*., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

occasionally stoop, kneel, crouch, or crawl. She is limited to simple routine tasks not performed at a production rate pace. She is limited to routine work changes. Tr. 25.

6. Through the date last insured, the claimant was unable to perform any past relevant work. Tr. 33.

7. The claimant was born in 1978 and was 36 years old, which is defined as a younger individual age 18-49, on the date last insured. Tr. 33.

8. The claimant has at least a high school education and is able to communicate in English. Tr. 33.

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills. Tr. 33.

10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that exist in significant numbers in the national economy that the claimant could have performed. Tr. 33.

11. The claimant was not under a disability, as defined in the Social Security Act, at any time from September 11, 2013, the alleged onset date, through December 31, 2014, the date last insured. Tr. 34.

## V. Plaintiff's Arguments

Townsend challenges the ALJ's decision on two grounds: the ALJ failed to properly evaluate her spine impairment at Step Three and failed to give good reasons for discounting the opinion of Dr. Hochman, her treating physician. Doc. 14, p. 1.

## VI. Legal Standard

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028,

1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)). A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

## VII. Analysis

### A. Substantial evidence does not support the ALJ's finding at Step Three

Townsend argues that the ALJ failed to properly evaluate Townsend's spine impairment pursuant to Listing 1.04. Doc. 14, p. 13. The ALJ considered Listing 1.04(A):

> Listing 1.04(A) requires that the claimant show disorder of the spine resulting in compromise of a nerve root or the spinal cord. In order to satisfy 1.04 via paragraph A, as [] alleged by the claimant's representative, the claimant would have to additional[ly] demonstrate nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, and motor loss. The objective imaging of record fails to reveal such a condition in either the lumbar or thoracic areas (Exhibits 4F/35, 38). In fact, magnetic resonance imaging (MRI) of the claimant's thoracic spine performed in 2013 revealed no frank cord compression (Exhibit 4F/38). Further, although there is some indication that the claimant experienced weakness of the extensor hallucis longus (EHL) and tibialis exterior (Exhibit 4F/14), the physical examinations of record more routinely reveal full muscle strength (E.g., Exhibits 4F/28, 44; 5F/22; 6F/4, 9F/123; 13F/3). As such, the undersigned finds that the claimant's degenerative disc disease failed to meet or medically equal listing 1.04 through the date last insured.

Tr. 23. Townsend's June 2014 lumbar MRI shows mild mass effect on the exiting nerve root at the L4-L5 level. Doc. 14, p. 16. The ALJ, however, wrote that "objective imaging of record fails to reveal [nerve root compression]" in Townsend's lumbar spine, without explaining Townsend's lumber MRI results.

As for the records the ALJ cites for full muscle strength, these do not show evidence that she routinely presented with full muscle strength. The ALJ cited 4F/28 (Tr. 362), 44 (Tr. 378); 5F/22 (Tr. 407); 6F/4 (Tr. 430), 9F/123 (Tr. 597); and 13F/3 (Tr. 645). Three of these records (Tr. 378, 430, 645) are identical notes from a visit with Townsend's podiatrist on July 14, 2014.

17

The podiatrist found "5/5 muscle strength for all groups"; on that visit, Townsend also had diminished sensation in her left foot. The other three records (Tr. 362, 407, 597) are from Townsend's one emergency room visit on September 12, 2013, her alleged onset date. She had 5/5 strength in her lower extremities. The fact that Townsend had full strength on her alleged onset date (when she presented to the emergency room for a thoracic spine injury) and a podiatrist found her to have full strength in her feet, once, in July 2014, does not provide substantial evidence that Townsend routinely presented with full muscle strength in her lower extremities.

### B. The ALJ's decision was deficient in other ways

Other portions of the ALJ's decision are problematic. First, the ALJ remarked that Townsend had not taken pain medications for the three years preceding her alleged onset date and appeared to conclude that Townsend's failure to do so indicated her pain was not as severe as alleged. Tr. 27. But the record shows that Townsend did not take pain medication because she could not due to the fact that she was pregnant and/or nursing, not because she did not have pain. Second, when discussing Townsend's lumbar issues, the ALJ remarked that Townsend was "only" found to have positive findings in her thoracic area, not her lumbar area, in a June 2014 visit with Dr. Hochman. Tr. 28 (citing Exhibit 2F/6, Tr. 307). The ALJ failed to recognize that Townsend's visit with Dr. Hochman that day was only for her thoracic spine, as her lumbar spine issue had not yet been included in her worker's compensation claim and, therefore, Dr. Hochman was not assessing her lumbar impairment.[4]

Third, the ALJ cites "another accident occurring around June 2014" that aggravated Townsend's lumbar spine. Tr. 28. Both Townsend and Defendant agree that Townsend suffered

---

[4] At the hearing, Townsend's counsel explained that, for billing purposes, Dr. Hochman can only address one worker's compensation injury per treatment note. Tr. 47.

no accident in June 2014 and that the ALJ made a mistake with respect to the record. Doc. 14, p. 17; Doc. 15, p. 13, n.3. This mistake by the ALJ is noteworthy because the basis of her decision was that Townsend kept re-aggravating her spinal injuries, as opposed to Townsend's degenerative spinal impairments gradually worsening over time. Tr. 27 ("[T]ellingly, the claimant's worst examinations of record typically surround acute injuries causing temporary exacerbation of her symptoms."). Finally, the ALJ stated that she found Townsend's activities of daily living to be inconsistent with disability, citing the fact that she took care of her children. Tr. 26. The ALJ did not mention the fact that Townsend had stated that she took care of her children only with significant help from others.

In sum, the ALJ's findings at Step Three and other portions of her decision are not supported by the record. The Commissioner's decision is reversed so that the ALJ can reevaluate the record.

## VIII. Conclusion

For the reasons set forth herein, the Commissioner's decision is **REVERSED and REMANDED** for further proceedings consistent with this opinion.[5]

IT IS SO ORDERED.

Dated: August 29, 2018

*/s/ Kathleen B. Burke*

Kathleen B. Burke
United States Magistrate Judge

---

[5] This opinion should not be construed as a recommendation that, on remand, Townsend be found disabled.